FILED IN CHAMBERS
U.S.D.C. Atlanta

JUL 1 0 2006

LUTHER D. THOMAS, Clerk
By: ⟨signature⟩ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

EDWARD J. REESE,

        Plaintiff,

   v.

JOSH HERBERT, et al.,

        Defendants.

CIVIL ACTION

NO. 4:05-CV-0193-RLV

O R D E R

This action pursuant to 42 U.S.C. § 1983 is before the court on motions for summary judgment filed by defendants Josh Herbert, Danny Ellis, Joe Geddie, Phillip Street and Jason Geddie [Doc. Nos. 24 and 28]. Also before the court are defendants' Herbert, Ellis, Joe Geddie, and Street, [herein known as the "Dade County defendants"] motion for leave to file excess pages in their brief in support of their motion for summary judgment [Doc. No. 23], the plaintiff's motion for leave to file a Second Amended Complaint [Doc. No. 33], and Dade County defendants' motion for an order disallowing the plaintiff's use of an expert witness [Doc. No. 50].[1]

---

[1] The Dade County defendants have also filed four "Notices of Objection." The Dade County defendants' "Notices of Objection" addressed the affidavits of Vandiver W. Keller, Mac Craig, Amanda Higdon, and Carol Reese [Doc. Nos. 51, 52, 53, 54], which were submitted by the plaintiff as evidence in opposition to the Dade County defendants' motion for summary judgment. The court viewed the "Notices of Objection" as motions to strike.

# I. Factual Background and
## Procedural History

The facts presented here are excerpted from the parties'
Statement of Material Facts as well as the court's independent
review of the record.[2]   The plaintiff, Edward J. Reese, is the

_____

[2] Local Rule 56.1(B)(2) provides:

(2) A respondent to a summary judgment motion shall
include the following documents with the responsive
brief:
a. A response to the movant's statement of undisputed
facts.
(1) This response shall contain individually numbered,
concise, nonargumentative responses corresponding to each
of the movant's numbered undisputed material facts.
(2) This Court will deem each of the movant's facts as
admitted unless the respondent: (i) directly refutes the
movant's facts with concise responses supported by
specific citations to evidence (including page or
paragraph number); (ii) states a valid objection to the
admissibility of the movant's fact; or (iii) points out
that the movant's citation does not support the movant's
fact or that the movant's fact is not material or
otherwise has failed to comply with the provisions set
out in LR 56.1 B.(1).
(3) The court will deem the movant's citations supportive
of its facts unless the respondent specifically informs
the court to the contrary in the response.
(4) The response that a party has insufficient knowledge
to admit or deny is not an acceptable response unless the
party has complied with the provisions of Fed. R. Civ. P.
56(f).

In his response to the "Statement of Material Facts of
Defendants Herbert, Ellis, Joe Geddie, and Street", the plaintiff
failed to comply with Local Rule 56.1(B)(2)(a)(1) [Doc. No. 34].
Specifically, the plaintiff merely states, "Plaintiff contends that
genuine issues of material fact remain to be tried by a jury in
regard to material allegations of the following paragraphs: 4, 5,
6, 7, 9, 10, 11, 14, 15, 18, 21 (opinion, not fact), 22, (opinion,
not fact), 23 (opinion, not fact), 29, 30, 31, 32, 34, 35, 36, 37,
38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54,
57, 58, 59, 60, 61, 62, 63, 64, 66, 70, 71, 76, 77, 78, 79, 81, 82,

owner of an apartment complex located on Heritage Trail in Trenton, Georgia, which is located in Dade County, Georgia.   On September 18, 2003, Joe Geddie, a Dade County Deputy Sheriff, was dispatched to the Mountain Heritage Apartments to respond to a domestic violence call.   The dispatcher advised that there was a domestic dispute between a boyfriend and girlfriend, that the father of the aggressor was en route, and that an officer would need to keep the peace to prevent a fight.   Deputy Joe Geddie arrived at the scene at 7:57 p.m.   Josh Herbert, also a Dade County Deputy Sheriff, responded to the domestic violence call to assist Joe Geddie, arriving shortly after Deputy Geddie.   Danny Ellis, a Dade County Deputy Sheriff, and Jason Geddie, a Georgia State Trooper, arrived at the apartment complex shortly after Herbert had arrived in order to provide backup for the two deputies.   When Ellis and Jason Geddie arrived at the scene, it appeared to them that the domestic violence situation was under control, and Ellis and Jason Geddie remained in their vehicles.   Joe Geddie arrested the alleged female aggressor involved in the domestic violence incident and placed her in the back of his patrol car at 8:03 p.m.   Shortly after Herbert

---

85, 87, 91, 92, 93, and 98)." Given the plaintiff's non-compliance with Local Rule 56.1(B)(2)(a)(1), the court viewed defendants' Herbert, Ellis, Joe Geddie and Street Statement of Undisputed Material Facts admitted pursuant to Local Rule 56.1(B)(2)(a)(2). Likewise, the court deemed all of Jason Geddie's "Statement of Undisputed Facts" admitted for the same reason [Doc. No. 28, Ex. A].

arrived at the scene, the parents of the alleged female aggressor arrived and came into the apartment to question Joe Geddie regarding the situation.   Joe Geddie told the parents of the alleged aggressor to leave the apartment.  Herbert remained outside of the apartment in an attempt to make sure no one entered the apartment as Joe Geddie interviewed the alleged victim.

While all of this was transpiring, the plaintiff drove to the scene and sat in his vehicle for a few minutes before exiting it. The plaintiff then approached Herbert inquiring why it was necessary for so many vehicles to be present and why the vehicles were blocking the entrance to the complex for such a long time.[3] With regard to his conversation with Herbert, the plaintiff testified:

A: I asked him who was in charge.

Q: That was the first words you said to him?

A: Yes.

Q: What was his response?

A: We are.

Q: Okay.  Then what did you say?

A: I said, we who.

Q: Just tell me what your conversation was as best you remember.

---

[3] The evidence in the record indicates that when the plaintiff approached the scene the police officers had been at the scene for no more than a few minutes.

4

A: I said, we who.  He said, Dade County Sheriff's
Department.  I said, who is the officer in charge,
something to that effect.  The best I remember he said,
Corporal Geddie, he's inside, he's busy, what do you
want.  I asked him if it was necessary for all those cars
to still be there.  He said yes, and you better get your
butt out of here or you'll be going to jail or something
to that effect.  I said, no, you don't understand, I own
this property.  And he just fired off.

It is undisputed that Herbert told the plaintiff to leave the

scene several times, yet the plaintiff failed to comply with

Herbert's request to leave the scene.  However, there is a factual

dispute in the record with regard to whether the plaintiff was

specifically told that he was under arrest.  The plaintiff alleges

that after his discussion with Herbert he attempted to approach a

different officer to ask the same questions and Herbert grabbed

him, threw him up against a wall, and then threw him to the ground.

In contrast, Herbert testified that he told the plaintiff he was

under arrest prior to reaching for his arm.[4]

———————————————

[4] Specifically, Herbert testified:

A: He came walking up, why are all these police cars
doing here.  We've had a domestic call out here,
everything is okay, you can go ahead and leave.  I'm not
leaving, I'm the landlord, and I want to know who is in
charge.  Sir, Corporal Geddie is in charge, he's inside.
Some of the other people that were there, they started to
talk about some damage inside.  At that point I told
everybody they could all, I said, listen, everybody,
y'all need to go ahead and leave.  And then the third and
final time Ed Reese told me he was not leaving because he
was the landlord I said he was under arrest, and I
grabbed his arm.

Q: What was his response when you told him he was under
arrest?

5

Herbert called for assistance and was joined by Ellis, Joe Geddie, and Jason Geddie.   Thereafter, a struggle ensued between the four officers and the plaintiff as the four officers attempted to handcuff the plaintiff.[5]

---

A: I grabbed his arm, and he pulled away from me.  He said, don't put your hands on me, and his hand went in a fist.  He put his hand in a fist and said, don't put your hands on me.

[5] With regard to the struggle that ensued, the plaintiff testified:

Q: Before you could go talk to the trooper he attacked you?

A: Yeah.

Q: Were you facing him when he attacked you?

A: I wasn't looking at him, I think I was turning.  The trooper's car was parked parallel with the road, because I could see it out of the corner of my eye, which I had noticed that before, but it didn't, it only registered when I realized I needed to talk to somebody with more than one brain cell.

Q: So you turned to the left or to the right?

A: Turned to the left.

Q: He took ahold of your left arm, you went in to the wall of the- -

A: He threw me into the wall.

Q: Of the apartment?

A: The best I can remember, because we was standing in front of it. I wasn't looking directly at him.  Somebody said he hit me in the chest with his fist, but I didn't see him do that, I just know, wham, I was up against a wall.

6

Ellis and Jason Geddie arrived at the location of the physical altercation between the plaintiff and Herbert just as the two were falling to the ground.  When they fell to the ground, the plaintiff and Herbert fell into Ellis and caused Ellis to fall on top of them.  The plaintiff and Herbert were on the ground wrestling when Joe Geddie came outside the apartment.  At this point, the plaintiff was face down on the ground, with either one or both of his hands tucked under his body.  The plaintiff refused Herbert's repeated requests for him to get off of his hand or hands so he could be handcuffed.

At this time, Ellis grabbed the plaintiff's left arm and placed his right hand on the back of the plaintiff's left shoulder so that the handcuffs could be placed on the plaintiff's left hand. While pulling the plaintiff's left arm back, Ellis felt the muscle

---

Q: After you hit the wall you went I guess forward out into where the mulch and stuff was?

A: Yes.

Q: When you fell did he have ahold of your left arm then?

A: Yes.

Q: Had he already put a handcuff on you?

A: No, he just had my left arm behind me.  I think he had his knee on my head, on my neck, but I'm not sure because it happened so fast.  Immediately after that seems like everybody piled on me.

7

in the plaintiff's arm "go soft."[6]  At that time, Herbert placed the handcuff on the plaintiff's left arm.  To assist in the arrest, Jason Geddie positioned his body near the plaintiff's head and applied a pressure point technique to the plaintiff's neck in an attempt to subdue him.  At that time, Joe Geddie applied pepper spray to the plaintiff's face.  After being sprayed with the pepper spray, the plaintiff complied with the officers' requests for his hand and the officers were able to effect the plaintiff's arrest. The plaintiff's right arm then came back and Herbert put the handcuff on it.[7]

---

[6] On this point, Ellis testified:

Q: Okay.  What happened next?

A: I took hold of Mr. Reese's wrist, finally got it out to a point, and he jerked back.  I had pulled his watch off when I had grabbed there, it came off.  I got another hold of Mr. Reese's arm and pulled it out.

Q: This is the left arm still?

A: Yes, sir, the left arm.  I had placed my other I want to say it was my right hand on the back part of his shoulder or arm part here, triceps, and come about. Well, as I was coming about we were still saying, please stop resisting, stop resisting, I felt just the muscle go sort of soft, just a muscular feeling.  I can't explain it, I never felt anything like that.  But when I felt that I stopped the pull, and they brought the cuff to him and cuffed his arm there where it was at instead of trying to take it any further just in case there was an injury.

[7] While the videotapes submitted by the Dade County defendants did not contain a clear video of the incident, the audio of the incident clearly reflects that the plaintiff cried out in pain. First, the plaintiff stated that the officers' actions were going

After applying the pepper spray, Joe Geddie then directed his attention to the other individuals who were standing outside the apartment in order to make sure that they stayed back. After the plaintiff was handcuffed, Herbert placed the plaintiff in the back of his patrol car. Ellis and Jason Geddie returned to their patrol cars after the plaintiff was arrested.[8]

At 8:20 p.m., Herbert transported the plaintiff to the Dade County Jail, arriving at 8:23 p.m. Herbert then assisted the plaintiff into a chair and asked the detention officer to call a medic. An ambulance was dispatched to the Dade County Jail for the plaintiff at 8:28 p.m. The plaintiff was en route to Erlanger Hospital in the ambulance at 8:56 p.m. The plaintiff arrived at Erlanger Hospital at 9:18 p.m.[9] Thereafter, the plaintiff was

───────────────

to cause him to have a heart attack, then the plaintiff stated that his arm was broken. The videotape reflects that the plaintiff told Herbert numerous times that his arm was broken both during the struggle to handcuff him and while he was in Herbert's patrol car.

[8] As discussed below, the court examined the affidavits of Mac Craig and Carol Reese. In their affidavits, Craig and Reese state that all four of the law enforcement officers punched and kicked the plaintiff while all four of the officers were on top of him. However, on this point the court gave the affidavits of Craig and Reese little weight because the plaintiff did not properly dispute the Statement of Undisputed Material Facts submitted by the Dade County defendants and Jason Geddie.

[9] The plaintiff was subsequently examined by Dr. Robert Mastey in Chattanooga, Tennessee. Dr. Mastey noted that the plaintiff had "multiple contusions of the chest and abrasions of the lower extremities, pain in the neck and lumbar back area, a small fracture on the inside of the elbow, a chipped fracture off the triquetrous bone in the wrist, hyper extension, and internal rotation injury in that region."

9

charged with obstruction pursuant to O.C.G.A. § 16-10-24(a).

On September 6, 2005, the plaintiff filed the instant complaint against Herbert, Ellis, Jason Geddie, Joe Geddie, and Street in both their individual and official capacities, alleging that the defendants had violated his Fourth and Fourteenth Amendment rights by using excessive force in effecting his arrest. The plaintiff also alleged that the defendants committed a number of Georgia state law torts.

On November 2, 2005, the Dade County defendants moved for partial judgment on the pleadings, arguing that the plaintiff's federal law claims against these defendants in their official capacities and the plaintiff's state law-based causes of action should be dismissed [Doc. No. 8]. On November 21, 2005, the plaintiff filed his First Amended Complaint [Doc. No. 11]. In the First Amended Complaint, the plaintiff removed the federal law claims against all of the defendants in their official capacities and dismissed all of the state-based claims against all of the defendants. On December 7, 2005, the court entered an order denying as moot the Dade County defendants' motion for partial summary judgment [Doc. No. 17].[10]

The plaintiff's only remaining causes of action are against defendants Herbert, Ellis, Joe Geddie, and Jason Geddie in their

_____

[10] On April 10, 2006, the plaintiff filed a motion for leave to file a "Second Amended Complaint" [Doc. No. 33].

individual capacities for an alleged violation of the plaintiff's Fourth Amendment and Fourteenth rights arising out of the alleged excessive force used by the four officers in effecting his arrest. Additionally, the plaintiff claims that Herbert denied him medical treatment for his arm injuries.

The plaintiff also sued Phillip Street, Sheriff of Dade County, for failure to adequately train and supervise his deputies in the use of force.  It is undisputed that the Dade County Sheriff's office under Street did not retain a log of complaints against officers.  According to Street, if an individual called him and complained about one of the deputies, Street would tell that individual to file a written complaint.  When an individual filed a written complaint against one of Street's employees, Street would read the complaint and then turn it over to the investigators or the employee's division supervisor for further inquiry, or, if the allegations were serious enough, call the Georgia Bureau of Investigation for investigation.  Street testified that he had received one or two complaints about an employee using excessive force in the 20 years he served as Dade County Sheriff.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his or her on which he or she bears the ultimate burden of proof. Id. at 322-23. Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322.

### III. Legal Analysis
### A. The Admissibility of Evidence Submitted by the Plaintiff

As a preliminary matter, the court must address the admissibility of certain evidence submitted by the plaintiff in opposition to the defendants' motions for summary judgment. The Dade County defendants filed four notices styled, "Notice of Objection" [Doc. Nos. 51, 52, 53, and 54]. The defendants argue that the affidavits of Vandiver W. Keller, Mac Craig, Amanda

Higdon, and Carol Reese should be ignored by this court. Additionally, the defendants moved to disallow the plaintiff's use of Keller's affidavit [Doc. No. 50]. The court must evaluate the admissibility of each of these items separately.

### 1. Keller's Affidavit

Federal Rule of Civil Procedure Rule 26(a)(2)(B) requires the parties to identify any witness who is to be used as an expert witness and requires the party to submit a report "prepared and signed by the witness." The report must contain the following information:

> a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Rule 26(a)(2)(B).

Until the expert's report has been provided, the deposition of the expert "shall not be conducted." Rule 26(b)(4)(A).

Local Rule 26.2(C), provides the following with respect to the timing for designating witnesses:

> Any party who desires to use the testimony of an expert witness shall designate the witness sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert and, if desired, to name its own expert witness sufficiently in advance of the close of discovery so that a similar discovery deposition

13

of the second expert might also be conducted prior to the
close of discovery.

Any party who does not comply with the provisions of the
foregoing paragraph shall not be permitted to offer the
testimony of the party's expert, unless expressly
authorized by court order based upon a showing that the
failure to comply was justified.

The Dade County defendants' motion to strike concerns the

plaintiff's submission of the affidavit of Keller, who is

purportedly an expert in law enforcement policies and procedures.

Specifically, the defendants argue that the plaintiff failed to

timely designate Keller as an expert witness and that Keller's

proposed opinion, therefore, is inadmissible [Doc. Nos. 50 and 51].

The Dade County Defendants state the following as the relevant

facts relating to the submission of Keller's affidavit:

On November 21, 2005, Plaintiff filed his Initial
Disclosures. In response to Paragraph 4, which requires
the parties to disclose the identity of any expert who
may be used at trial, Plaintiff responded "None know
[sic] at this time other than medical experts listed
above. Plaintiff will supplement this response as soon
as he retains additional experts." To date, these
Defendants have not received Plaintiff's supplemental
responses to his initial disclosures.

On or about February 9, 2006, twelve days before the close of

discovery, the plaintiff for the first time identified Keller as an

expert witness. Given the plaintiff's late disclosure of Keller,

the defendants argue Keller's affidavit should be ignored.

Specifically, the Dade County defendants argue:

Because of the Plaintiff's failure to follow the Local
Rules and Federal Rules, from the time the Plaintiff
finally identified his expert, Vandiver W. Keller, these

14

Defendants did not have time to depose said expert, review the deposition of Plaintiff's expert and decide if they needed rebuttal testimony, obtain a written report from a rebuttal expert, and for the rebuttal expert to be deposed all before the close of discovery.

The Dade County defendants cite <u>Hammond v. Gordon Co.</u>, 316 F. Supp.2d 1262, 1266 (N.D. Ga. 2002) for the proposition that an expert witness not timely disclosed should be stricken.   In <u>Hammond</u>, the plaintiffs failed to disclose their intended use of an expert until near the close of discovery.   The court in <u>Hammond</u> noted that the plaintiffs' late disclosure had prejudiced the defendants and, therefore, struck the plaintiffs' use of the expert.

In this case, the plaintiff has not provided the court with a sufficient reason for his delay in disclosing his expert witness.[11] Given the plaintiff's violation of Rule 26 and Local Rule 26.2, the court did not consider Keller's affidavit.   Therefore, the

_____

[11] Specifically, the plaintiff argues:

In this case, there was no intentional disregard of the rules, but an unintentional delay caused by the necessity of receiving and reviewing a large transcript that was not provided by the court reporter until very late in the discovery period, and the necessity for waiting for deposition transcripts for depositions that did not occur until near the end of the discovery period.

However, this argument is unpersuasive.   The plaintiff's proffered excuses do not explain why he did not disclose his expert earlier in the discovery process as mandated by Rule 26 and Local Rule 26.2.   Rather, the plaintiff's excuses merely address why his expert was not able to produce his affidavit earlier in the discovery process.

15

defendants' motions to disallow the use of Keller's affidavit is GRANTED [Doc. Nos. 50 and 51].

## 2. Affidavits of Mac Craig, Amanda Higdon and Carol Reese

The Dade County defendants argue that the affidavits of Mac Craig, Amanda Higdon, and Carol Reese also should be disregarded because these individuals submitted inconsistent testimony at the plaintiff's criminal trial and because the affidavits contain inadmissible opinion testimony.

In response, the plaintiff argues these affidavits are both relevant and admissible. Specifically, the plaintiff argues that these individuals' prior testimony to the extent that it is inconsistent goes to the weight of the evidence, rather than its admissibility. With regard to the opinions of Craig, Higdon, and Reese, the plaintiff argues that the Federal Rules of Evidence Rule 701 allows opinion testimony by lay witnesses.

On both of these points, the court agrees with the plaintiff. Therefore, the court examined and used these affidavits. However, to the extent that these affidavits contradicted the sworn testimony given at trial, the court disregarded the affidavit testimony. Therefore, the court DENIES the Dade County defendants' motions to strike the affidavits of Craig, Higdon, and Reese.[12]

---

[12] The Dade County defendants further contend that the affidavits of Craig and Reese contain inadmissable hearsay. To the extent that those affidavits contained inadmissable hearsay, the court did not consider such hearsay.

## B. The Plaintiff's Motion for Leave to File a Second Amended Complaint

Next, the court must determine whether to grant the plaintiff's motion for leave to file a Second Amended Complaint [Doc. No. 33]. The plaintiff states that he has submitted a Second Amended Complaint to "more accurately conform to the evidence as it has developed through discovery." Specifically, the plaintiff seeks to modify all of the allegations against Street, to add allegations regarding an initial improper arrest violating the plaintiff's due process rights, and to add an additional count for failure to provide medical treatment.

Both the Dade County defendants and Jason Geddie oppose the motion. The Dade County defendants argue that the plaintiff should not be allowed to amend his complaint for a second time because the plaintiff engaged in undue delay. On this point, the defendants argue that the plaintiff moved to amend after discovery concluded and after the Dade County defendants had already filed their motion for summary judgment. Specifically, they argue that the plaintiff's attempt to add new causes of action is merely an attempt to survive summary judgment because the defendants have not briefed or addressed these newly added causes of action in their motions for summary judgment. Additionally, the defendants argue that the plaintiff is attempting to add causes of action that were known to him at the time he filed his initial Complaint and his First Amended Complaint.

17

In deciding whether to allow the plaintiff to file a Second Amended Complaint, the court must examine Rule 15(a), which states:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served.   Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

While Rule 15(a) declares that leave to amend "shall be freely given when justice so requires," leave to amend is not an automatic right. Faser v. Sears Roebuck & Co., 674 F.2d 856, 860 (11th Cir. 1982).  A district court still has the power to manage the case, and leave will be denied if the amendment is offered: (1) after undue delay, in bad faith, or with a dilatory motive, (2) when the amendment would be futile, or (3) when the amendment would cause undue delay or prejudice. Burger King Corp. v. Weaver, 169 F.3d 1310, 1319 (11th Cir. 1999).

In this case, there are a number of reasons for denying the plaintiff's motion at this stage in the litigation.  In particular, the plaintiff has unduly delayed in filing his motion.  The plaintiff's Second Amended Complaint is based on facts which were known or were readily available to the plaintiff when he filed his initial complaint in September 2005 and in November 2005 when he filed his First Amended Complaint.

Prior to the close of discovery, the plaintiff had ample

opportunity to amend the complaint to fully and completely state the claims he is now pursuing via his attempted Second Amended Complaint.   He previously filed a First Amended Complaint in November 2005, after the defendants had filed a motion for partial judgment on the pleadings and thereafter had several months prior to the close of discovery to amend his complaint if he so chose. However, the plaintiff filed his current motion for leave to amend only after all of the defendants had filed motions for summary judgment.[13]  Therefore, the court views the plaintiff's motion for leave to file a Second Amended Complaint merely as an attempt to defeat the pending summary judgment motions.

Additionally, the plaintiff has not offered a sufficient reason for the delay in making the amendments to his First Amended Complaint.  The plaintiff's proposed Second Amended Complaint adds new causes of action as well as alleges new facts.  The plaintiff argues that the purpose of the proposed amendment is to have the complaint "more accurately conform to the evidence as it has been developed through discovery."  However, the Dade County defendants argue that this is an improper reason to allow an otherwise late amendment.   Specifically, the Dade County defendants argue that

---

[13] All of the defendants in this case were deposed on January 26, 2006 [Doc. Nos. 43, 44, 45, 46, 47].   The plaintiff's questioning of the defendants reflects that he was considering the possibility of bringing new causes of action against them. However, he did not file his motion until April 10, 2006, after the defendants had filed their motions for summary judgment.

Rule 15(b) provides for amending pleadings to conform to the evidence only when the defendant has consented to trial of the non-pled issues. The Dade County defendants continue, "There has been no trial in the present matter, thus it is entirely premature to amend the pleadings to conform to the evidence presented at trial." The court agrees.

Moreover, allowing the plaintiff to assert new causes of action would unduly prejudice the defendants because all discovery in this matter has been completed, and the defendants would not be able to conduct discovery regarding the newly added causes of action.

As noted above, the plaintiff offers no sufficient reason for the delay in making his current request for leave to file a Second Amended Complaint. Nor did he even respond to the defendants' opposition in a timely manner.[14]   Therefore, the court concludes that there are ample reasons to justify denying the plaintiff's motion to file a Second Amended Complaint. Consequently, the plaintiff's motion for leave to file a Second Amended Complaint is

---

[14]The plaintiff filed a reply brief on May 8, 2006, addressing the defendants' arguments concerning his filing a Second Amended Complaint [Doc. No. 63]. However, this brief was untimely, since the brief was due on April 26, 2006. Despite the fact that the plaintiff's brief regarding filing a Second Amended Complaint was untimely filed, the court reviewed the merits of the plaintiff's brief and found them to be unpersuasive.

DENIED.[15]

## C. Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).   To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).   Here, it is clear and undisputed that Herbert, Joe Geddie, Jason Geddie, and Ellis were acting within the course and scope of their discretionary authority when they arrested the plaintiff.   "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id.

The United States Supreme Court has set forth a two part test for the qualified immunity analysis.   "The threshold inquiry a court must undertake in a qualified immunity analysis is whether

_____

[15] The Dade County defendants also argue that since all of proposed new causes of action would fail even if this court allowed the plaintiff to amend his Complaint, any amendment of the plaintiff's Complaint is futile.  However, the court need not reach this issue because of the sufficiency of other grounds for denying the plaintiff's motion for leave to file a Second Amended Complaint.

21

[the] plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736 (2002); Saucier v. Katz, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201. However, "[i]f a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly established.'" Vinyard, 311 F.3d at 1346, quoting Saucier, 533 U.S. at 201.[16] Thus, the court must first analyze whether Herbert's conduct of arresting the plaintiff, taken in the light most favorable to the plaintiff, violated the plaintiff's constitutional rights.

### 1. False Arrest Claim

Even if the court had not denied the plaintiff's motion for leave to file a Second Amendment to assert a false arrest claim against Herbert, the plaintiff still would not have prevailed on

---

[16] Put another way, first the court must consider "in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 201. If, in doing this, the court finds that no constitutional right was violated, the inquiry ends there and the defendant is entitled to qualified immunity. If the facts disclose a constitutional violation, however, the court then must ask whether, at the time the violation occurred, "every objectively reasonable police officer would have realized the acts violated already clearly established federal law." Garrett v. Athens-Clarke Co., 378 F.3d 1274, 1278-79 (11th Cir. 2004).

22

this claim for the reasons that follow.[17]

While a warrantless arrest without probable cause violates the Constitution and provides a basis for a 42 U.S.C. § 1983 claim, the existence of probable cause at the time of arrest constitutes an absolute bar to a 42 U.S.C. § 1983 claim for false arrest. Marx v. Gumbinner, 905 F.2d 1503, 1505-6 (11th Cir. 1990). However, in the context of qualified immunity, the issue is not whether probable cause existed but instead whether there was "arguable probable cause" for the plaintiff's arrest. See Jones v. Cannon, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999)(noting that "arguable probable cause" and not the higher standard of actual probable cause governs the qualified immunity inquiry); see also Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997). Law enforcement officials who reasonably, but mistakenly, conclude that probable cause is present are entitled to qualified immunity. Hunter v. Bryant, 502 U.S. 224, 227 (1991).

Whether a particular set of facts gives rise to actual

---

[17]The First Amended Complaint asserted only an excessive force claim under the Fourth and Fourteenth Amendment and made no claim for false arrest. The Eleventh Circuit has held that any claim that excessive force was used in effecting an illegal stop or arrest is subsumed in the illegal stop or arrest claim and is not a separate, discrete excessive force claim. Jackson v. Sauls, 206 F.3d 1156, 1170-71 (11th Cir. 2000); see also Williamson v. Mills, 65 F.3d 155, 158-59 (11th Cir. 1995). Thus, the discussion that follows shows that Herbert is entitled to qualified immunity with respect to the excessive force claim contained in the First Amended Complaint and would also have prevailed on the false arrest/excessive force claim contained in the proposed Second Amended Complaint.

probable cause or "arguable probable cause" for an arrest depends
on the elements of the crime. Crosby v. Monroe County, 394 F.3d
1328, 1332 (11th Cir. 2004).   Therefore, in order to determine
whether either actual probable cause or "arguable probable cause"
existed to arrest the plaintiff, the court must first examine the
crime of felony obstruction under Georgia law.

O.C.G.A. § 16-10-24(a) provides, "[A] person who knowingly and
willfully obstructs or hinders any law enforcement officer in the
lawful   discharge   of   his   official   duties   is   guilty   of   a
misdemeanor."   The essential elements of this offense are (1) an
act constituting obstruction or hindering,(2) done knowingly and
wilfully, and (3) to an officer lawfully discharging his official
duties. Weidmann v. State, 222 Ga. App. 796, 797 (1996).   According
to Weidmann, the statute was made purposefully broad to cover
actions which might not be otherwise unlawful but which obstructed
or hindered law enforcement officers in carrying out their duties.
Id.[18]

---

[18] In his response brief, the plaintiff cites to Woodward v. The
State, 219 Ga. App. 329 (1995), and argues that a police officer is
not discharging his lawful duty when he arrests an individual
without reasonable or probable cause.  In Woodward, the defendant
had originally been charged with and convicted of felony
obstruction of a law enforcement officer, and the Georgia Court of
Appeals was reviewing whether there was sufficient probable cause
to support the defendant's conviction.  In Woodward, the Court of
Appeals found, "A belligerent telephone call earlier in the day,
without more, is not disorderly conduct and does not constitute
probable cause for an arrest."  There are several reasons why the
plaintiff's reliance on Woodward is misplaced.  First in this case
unlike Woodward, the actions constituting the offense charged and

Viewing the facts in the light most favorable to the plaintiff, the court finds that the plaintiff injected himself into a potentially volatile situation. Herbert was at the scene of a domestic violence call assisting Joe Geddie. Prior to the plaintiff's entrance on the scene, Joe Geddie had been approached by the parents of the alleged aggressor who were inquiring into the status of their daughter. It is undisputed that the parents of the alleged aggressor were present at the scene standing outside of the apartment relatively near Herbert. It is also undisputed that the plaintiff drove to the scene and waited in his car for several minutes before approaching Herbert. Then, the plaintiff approached Herbert and stood relatively close to Herbert.

With regard to his conversation with Herbert, the plaintiff testified:

A: I asked him who was in charge.

Q: That was the first words you said to him?

A: Yes.

Q: What was his response?

A: We are.

---

for which Herbert had or believed he had probable cause to arrest the plaintiff occurred in his presence. Second, this court and the Georgia Court of Appeals are conducting different inquiries. In Woodward, the Georgia Court of Appeals was determining whether given the facts in that case there was probable cause to support a conviction. In this case, the court's inquiry is solely focused on whether Herbert had at least "arguable probable cause" for the plaintiff's arrest.

25

Q: Okay.  Then what did you say?

A: I said, we who.

Q: Just tell me what your conversation was as best you remember.

A: I said, we who.  He said, Dade County Sheriff's Department.  I said, who is the officer in charge, something to that effect.  The best I remember he said, Corporal Geddie, he's inside, he's busy, what do you want.  I asked him if it was necessary for all those cars to still be there.  He said yes, and you better get your butt out of here or you'll be going to jail or something to that effect.  I said, no, you don't understand, I own this property.  And he just fired off.

It is undisputed that Herbert told the plaintiff to leave the scene and the plaintiff failed to leave as requested.  Although Herbert alleges that he told the plaintiff he was under arrest, the plaintiff contends that he was never told that he was under arrest. However, the plaintiff's own testimony indicates that he was warned by Herbert that he potentially could be arrested if he remained at the scene after Herbert warned him to leave the scene.  It is undisputed that the plaintiff remained at the scene after Herbert had told him to leave.  Whether Herbert specifically told the plaintiff that he was under arrest is unclear from a review of the evidence in the record.  However, it is undisputed that the plaintiff turned his back towards Herbert and attempted to walk away. At that time, Herbert attempted to grab the plaintiff's hand and the plaintiff pulled his arm away.

Given these facts, defendant Herbert had at least "arguable probable cause" to arrest the plaintiff and charge him with

26

O.C.G.A. § 16-10-24(a).[19]  In reaching this conclusion, the court is cognizant that qualified immunity protects law enforcement officials like Herbert who reasonably, but perhaps mistakenly, conclude that probable cause exists for an arrest in a situation. Hunter, 502 U.S. at 227.  Since at least "arguable probable cause" was present for the plaintiff's arrest, Herbert is entitled to qualified immunity for any false arrest claim presented by the

---

[19]The plaintiff cites Thornton v. City of Macon, 132 F.3d 1395, 1400 (1998), for the proposition, "Under the circumstances, the officers were not justified in using any force, and a reasonable officer thus would have recognized that the force was excessive." However, the situation in Thornton is different from the situation faced by Herbert.  In Thornton, Marjorie Mullis had requested police assistance in resolving a dispute between her and Mark Thornton, her former roommate regarding the exchange of certain possessions. At Mullis's request, a police officer took the set of Thornton's car keys which were in Mullis's possession to Thornton's apartment, where Thornton was standing on the front porch.  The officer stated that he was there to return Thornton's car keys and to pick up Mullis's mattress.  Thornton stated that he had done nothing wrong and asked the police to leave the premises.  When Mullis arrived a short time later, Thornton retreated to the inside of his apartment and repeatedly told the officer and Mullis to leave.  Instead of leaving, the police officer called for backup. The officers finally told Thornton that if he would open the screen door to his apartment they would give him his car keys.  However, when Thornton opened the door, "one of the officers grabbed Thornton's arm, and another grabbed Thornton around the neck.  The officers threw Thornton to the floor, cuffed his hands behind his back, picked him up by his arms, dragged him outside and shoved him into a police car." Thornton, 132 F.3d at 1398.  The Eleventh Circuit held that although police officers had the general duty and authority "to enforce the law and maintain the peace," their actions far exceeded such authority when they went beyond merely attempting to mediate and defuse a contentious situation.  The situation confronted by Herbert was vastly different from the situation in Thornton.

plaintiff.[20]

## 2. Excessive Force Claims

In his First Amended Complaint, the plaintiff alleges:

11. During the above referenced incident, Deputy Herbert called for assistance and was joined by Defendants Danny Ellis, Joe Geddie and Jason Geddie.

12. During the above referenced arrest, said Defendants threw Plaintiff Reese to the ground, handcuffed him, pushed his head down into the ground, beat Plaintiff about the face and body, severly [sic] injured Plaintiff's left arm at the elbow, and sprayed him in the face with "pepper spray."

13. The above-referenced handling and beating of Plaintiff Reese by Defendants Herbert, Ellis, Joe Geddie, and Jason Geddie was done wrongfully, intentionally, and with deliberate indifference to the rights of Plaintiff

---

[20] The recent Eleventh Circuit case of Davis v. Williams, 2006 WL 154145, *5 (11th Cir. 2006) does not require a contrary result. In Davis, the officers were conducting a routine traffic stop outside of a home when Davis, the owner of the home, noticed the flashing police lights outside his house. Davis exited his house and approached the two officers, Deputy Becht and Deputy Bright, to inquire into what was going on. In response, Deputy Becht told Davis to "[g]et away from here" and to "[l]eave now or I'll arrest you." Davis then asked if he could speak with the officer's supervisor and one of Davis' guests asked for the officer's badge number. Deputy Becht's response was to tell Davis that if "he continued to say anything, he would be arrested." When Davis started to walk back towards his house, the two officers grabbed him from behind, twisted his arms behind his back, and handcuffed him. Deputy Becht then dragged Davis to the police car, which was a canine unit, and forced him down on the ground. Then Deputy Bright and Deputy Becht dragged, pushed, or threw Davis very hard into the dog cage causing Davis to hit his head on the top of the car as he entered. Under those facts, the Eleventh Circuit found that there was no "arguable probable cause" for Davis' arrest for obstruction of justice under Florida law and that there was a triable issue of fact as to whether excessive force had been used to effect Davis' arrest. However, the facts of this case are significantly distinguishable from those of Davis.

Reese, and constituted excessive and unreasonable force.

In his response to the Dade County defendants' motion for summary judgment, the plaintiff argues:

> Genuine issues of material fact exist as to whether or not reasonable officers could have believed that grabbing Reese by the arm when he had committed no crime whatsoever, slinging him up against the wall and choking him, throwing him to the ground with a 240 pound officer on top of him, with his left arm bent back behind him, kicking, punching and beating Mr. Reese, twisting Mr. Reese's arm up behind his back to the point where it fractured his arm in two places and ripped muscles and ligaments completely off the bone, spraying Mr. Reese with pepper spray after the above referenced physical abuse and while four younger and larger officers were on top of him and had him subdued with his injured arm behind him and handcuffed, amounted to excessive force.

In their motions for summary judgment, the Dade County defendants as well as Jason Geddie argue that the doctrine of qualified immunity bars the plaintiff's excessive force claim against them because when their actions are considered from the perspective of a reasonable police officer given the circumstances, the court must conclude that the amount of force used in restraining the plaintiff was reasonable. Additionally, the defendants argue that the plaintiff is not able to overcome his burden of showing that they violated "clearly established" law of which a reasonable officer should have known. Given these arguments, the court must examine whether each of the individual

defendants is entitled to qualified immunity.[21]

As stated above, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard, 311 F.3d at 1346 quoting Harlow, 457 U.S. at 818.  To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Lee, 284 F.3d at 1194.  As noted above, it is undisputed that Herbert, Joe Geddie, Jason Geddie, and Ellis, were acting within their discretionary authority at all times pertinent to the plaintiff's complaint.

The United States Supreme Court has held that claims of excessive force in the course of an arrest, investigatory stop, or other seizure, should be analyzed under the Fourth Amendment and

---

[21] In his response to Dade County defendants' motion for summary judgment, the plaintiff does not address the individual actions of the individual defendants.  Rather, the plaintiff's response and the First Amended Complaint reads as though all four officers physically threw the plaintiff's head into the ground, that all four officers physically injured the plaintiff's left arm, and that all four officers physically sprayed the plaintiff in the face with pepper spray.  However as discussed above the plaintiff did not properly dispute either of the Statements of Material Undisputed Facts submitted by the Dade County defendants or Jason Geddie. Since there is no evidence that all four officers performed each and every one of the acts alleged in the First Amended Complaint, the court must examine the acts of the individual officers to determine whether each of the acts committed by the four individual officers constituted a constitutional violation.

its "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 388 (1989). This standard requires balancing the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interests alleged to justify the intrusion. Tennessee v. Garner, 471 U.S. 1, 7-8 (1985). The reasonableness of a particular use of force must be considered from the perspective of a reasonable officer on the scene rather than by employing 20/20 hindsight. Saucier, 533 U.S. at 204-205. Whether the force is reasonable hinges on the facts and circumstances of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

Police officers are often forced to make split-second judgments in circumstances that are "tense, uncertain, and rapidly evolving" about the amount of force that is necessary in a particular situation. Graham, 490 U.S. at 396-397. Therefore, not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. Id. Because "[g]overnment officials are not required to err on the side of caution," Marsh v. Butler County, Ala., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001), qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions

31

were lawful. <u>See Saucier</u>, 533 U.S. at 205-206.

Since Herbert, Joe Geddie, Jason Geddie, and Ellis were acting in the scope of their authority as discussed above, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. <u>Lee</u>, 284 F.3d at 1194.   The Supreme Court has set forth a two-part test for qualified immunity analysis.   "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." <u>Hope</u>, 536 U.S. at 736 .   If a constitutional right would have been violated under the plaintiff's version of the facts, the next, sequential step is to ask whether the right was clearly established. <u>Saucier</u>, 533 U.S. at 201-202.   Under this two-step process, the court must first analyze whether the actions of defendants Herbert, Joe Geddie, Jason Geddie, and Ellis violated the plaintiff's constitutional rights.[22]

### a. Herbert

The plaintiff argues, "There is no evidence that indicates

---

[22] In <u>Graham</u>, the Supreme Court held that when the use of force by law enforcement officers arises in the context of an arrest, investigatory stop, or other seizure, the appropriate--indeed, sole--source of constitutional protection is the Fourth Amendment. In fact, the <u>Graham</u> court ruled that most excessive force cases born out of the course of an arrest, investigatory stop, or other seizures of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard, rather than under the 14th Amendment's "substantive due process" analysis. <u>Id</u>. at 395. Therefore, the plaintiff's § 1983 claims based on a violation of the 14th Amendment against all of the defendants in their individual capacities fail as a matter of law.

that Reese posed any immediate threat to the safety of the officers or others.  Likewise, there is no evidence that he ever attempted to evade arrest by flight, and there is no evidence that he 'actively' resisted arrest, as opposed to passively resisting."[23] In response, Herbert concedes that the crime for which the plaintiff was being arrested was one of minor severity.  However, Herbert argues that the plaintiff "was meddling in an already tense situation and Plaintiff actively and forcibly resisted arrest. While Plaintiff did receive a painful injury that required surgical intervention, the only force used was that designed to effect Plaintiff's arrest."

As stated above, the court has concluded that Herbert had "arguable probable cause" to arrest the plaintiff for a violation of O.C.G.A. § 16-10-24(a).  Thus, defendant Herbert had the right to use some degree of physical coercion to effect the plaintiff's arrest. See Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004).

With regard to the amount of force used to effect the plaintiff's arrest, Herbert argues:

---

[23] The plaintiff attempts to draw a distinction between what he labels as passive resistance and active resistance.  Citing to Keller's affidavit, the plaintiff argues, "The active resistance requirement would seem to require more than simple 'passive' resistance, such as lying on the ground with your hands pinned underneath you."  However, the court finds this argument unpersuasive.

It is undisputed that once the physical struggle began, Defendant Herbert never again touched Plaintiff's left arm and that Defendant Herbert did not administer the pepper spray to Plaintiff. Rather, Defendant Herbert placed the handcuffs on Plaintiff's arms when one of the other officers got Plaintiff's arms behind his back.

In examining the record, the court finds that the plaintiff has failed to identify any specific conduct attributable to Herbert that constitutes excessive force. Moreover, the plaintiff has failed to present evidence establishing a causal link between Herbert's conduct and the plaintiff's injury.

The court concludes that under the totality of the circumstances which existed on the evening of September 18, 2003, the amount of force utilized by Herbert in arresting the plaintiff was reasonable. In reaching this conclusion, the court placed considerable weight on the fact that the plaintiff injected himself into an already tense situation present at the scene of a domestic violence call, that there were several of the alleged aggressor's relatives present at the scene, that Herbert asked the plaintiff to leave the scene repeatedly and the plaintiff refused to leave, and that the plaintiff admitted that he engaged in "passive" resistance, i.e., his refusal to provide his hands to be handcuffed. Since the plaintiff has not demonstrated that Herbert's actions in attempting to handcuff the plaintiff violated a constitutional protection, Herbert is entitled to qualified immunity and the plaintiff's excessive force claim against him fails.

34

### b. Ellis

It is undisputed that Ellis was sitting in his patrol car when the plaintiff approached Herbert. It is also undisputed that Ellis did not get out of his vehicle until he saw Herbert grab the plaintiff's arm and the plaintiff jerk away from Herbert.

The facts in the record indicate that when Ellis approached the plaintiff and Herbert, they fell to the ground and knocked Ellis down. Ellis was on the plaintiff's left side trying to get the plaintiff's left arm behind the plaintiff's back in order to handcuff him. Ellis grabbed the plaintiff's wrist and the plaintiff jerked his arm out of Ellis' grasp. Then Ellis grabbed the plaintiff's left arm and tried to pull it behind the plaintiff's back. Ellis admits he put his right hand on the back of the plaintiff's left shoulder so that he could pull his arm back. While pulling the plaintiff's arm back, Ellis admits that he felt the muscle in the arm "go soft." Ellis states at the time the plaintiff's left arm went limp that he stopped pulling.

By all accounts, the scene Ellis encountered was chaotic. Herbert and the plaintiff fell into Ellis causing Ellis to fall on to the ground on top of the plaintiff. Herbert was yelling for the plaintiff to "Stop resisting!" The plaintiff was yelling, "I am not resisting!"; yet he refused to provide Herbert with his hands to be handcuffed. Given the above facts, the court concludes that there was a need for Ellis to apply some degree of physical force

when he assisted in the arrest of the plaintiff. The record indicates that Ellis' involvement was limited solely to trying to secure the plaintiff's left arm behind the plaintiff's back so that the plaintiff could be handcuffed.

While Ellis' actions might have contributed to or even caused the plaintiff's injury, Ellis' actions of assisting the arrest by grabbing the plaintiff's left arm in an attempt to handcuff him is not a violation of the plaintiff's constitutional rights. Therefore, Ellis is entitled to qualified immunity with respect to the plaintiff's excessive force claim.

### c. Jason Geddie

Jason Geddie argues that he is entitled to qualified immunity for several reasons. First, he reasonably believed that Herbert required assistance to effect the arrest of the plaintiff, thereby establishing the need for the application of force. Second, any force that he used against the plaintiff was de minimis and reasonable under the circumstances. Finally, his conduct did not violate any clearly established statutory or constitutional right. On all of these points, the court agrees.

In support of his motion for summary judgment, Jason Geddie cites to Crosby, 394 F.3d at 1334. In Crosby after officers took the suspect to the ground and disarmed him, the suspect attempted to raise his head and speak. One of the officers who did not know whether the suspect was armed and seeing that the suspect was not

36

yet handcuffed used his foot to push the suspect's head back to the ground.  The suspect's response was to pull his hand away from the officer trying to handcuff him, push the officer's foot off of his face, and swear at the officer.  The officer took no other action. The Eleventh Circuit held that because the suspect may still have been armed and was not docile during the arrest, "a reasonable officer could have believed that the [use of his foot to push the suspect's head to the ground] was reasonably necessary in the situation."

In this case, it is undisputed that Jason Geddie did not see how the altercation between the plaintiff and Herbert began.  As Jason Geddie approached the scene, the plaintiff and Herbert were on the ground.  Jason Geddie stated that he did not know whether the plaintiff was armed, had committed a crime, was under arrest, or how great the physical threat to Herbert the plaintiff posed. Jason Geddie argues that given these facts he could have reasonably believed that his assistance was needed to effect the arrest. Furthermore, Jason Geddie states that he believed that some degree of physical force was necessary to effect the arrest because the plaintiff was actively resisting Herbert's verbal requests to be handcuffed and to stop resisting.

It is undisputed that the only physical contact Jason Geddie made with the plaintiff was his use of a "soft hands" pressure

point technique to the back of the plaintiff's neck.[24]  It is also undisputed that Jason Geddie's use of this "soft hands" pressure point technique was not severe in nature nor did the technique cause any injury.

Because it is undisputed that Jason Geddie's only physical contact with the plaintiff was his use of a "soft hands" pressure point technique to the back of the plaintiff's neck and because such force was de minimis, the plaintiff is unable to prove that Jason Geddie violated any of his constitutional rights.  See Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003)("the application of de minimis force, without more, will not support a claim for excessive force in the violation of the Fourth Amendment.")  Therefore, Jason Geddie is entitled to qualified immunity as to the plaintiff's excessive force claim against him.

### d. Joe Geddie

Joe Geddie did not come from outside the apartment until he heard a loud "thud" against the apartment wall and heard Herbert yelling for assistance.  Once Joe Geddie went outside the apartment, he saw the other officers and the plaintiff on the ground.  Furthermore, Joe Geddie saw the plaintiff resisting the officers' attempts to place him in handcuffs.  Joe Geddie admits that he administered pepper spray in an attempt to subdue the

---

[24] The plaintiff never submitted any response to Jason Geddie's Statement of Undisputed Facts; therefore, the court deemed all of Jason Geddie's facts admitted.

plaintiff.  After Joe Geddie administered the pepper spray to the plaintiff, the other officers were able to restrain the plaintiff and effect his arrest.

The plaintiff cites to <u>Vinyard</u>, for the proposition that the use of pepper spray against an unresisting arrestee may be held to be excessive force.  However, the plaintiff's reliance on <u>Vinyard</u> is misplaced.  In <u>Vinyard</u>, the Eleventh Circuit examined the constitutionality of using pepper spray on a handcuffed arrestee who posed no threat of harm to the police officer or the public.  Specifically, the arrestee was already handcuffed in the back of the officer's patrol car on the way to the jail when the officer stopped the patrol car, grabbed the female arrestee, and pepper sprayed her.

In this case, it is undisputed that when Joe Geddie applied the pepper spray, the plaintiff had not yet been fully subdued or handcuffed.  In fact, the plaintiff was resisting the efforts of the other officers to handcuff his right arm when Joe Geddie administered the pepper spray.  It is undisputed that Joe Geddie's application of the pepper spray aided the other officers in handcuffing the plaintiff.  Therefore, the court finds that the facts of <u>Vinyard</u> are significantly distinguishable from the facts presented here and does not control.[25]

---

[25] The plaintiff cites to two cases from the Ninth Circuit for the proposition that use of pepper spray and failure to wash out the arrestee's eyes with water amounted to a use of excessive

The court concludes that Joe Geddie's sole action in this case, i.e., administering the pepper spray to the plaintiff's face in an attempt to aid the other officers' attempts to handcuff the plaintiff, does not constitute a constitutional violation. Therefore, Joe Geddie is entitled to qualified immunity as to the plaintiff's excessive force claim against him.

### e. Did Herbert, Ellis, Joe Geddie, and Jason Geddie Violate Clearly Established Law?

Alternatively, the Dade County defendants argue, "Even assuming arguendo that Plaintiff has alleged the violation of a constitutional right, Defendants Herbert, Ellis, and Joe Geddie are still entitled to qualified immunity as they did not violate clearly established law."  The Dade County defendants argue:

> A narrow exception exists to the rule requiring particularized case law to establish the law in excessive force cases.  When an excessive force plaintiff shows "that the official's conduct lied so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw," the official is not entitled to the defense of qualified immunity. . . . To come within the narrow exception, a plaintiff must show that the official's conduct "was so far beyond the hazy border between excessive and acceptable force' that [the official] had to know he was violating the Constitution even without caselaw on point." Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000)(citations omitted).

---

force.  However, the plaintiff has failed to include these allegations in his First Amended Complaint.  Furthermore, the court could find no binding Eleventh Circuit precedent for the plaintiff's position even if the issues were properly before the court.

Likewise, Jason Geddie argues that he "has not violated any clearly established law of which a reasonable official should have been aware."

On this point, the plaintiff argues:

The 11th Circuit has repeatedly held that police officers cannot use force that is "wholly unnecessary to any legitimate law enforcement purpose." Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002)(denying qualified immunity where officers slammed a handcuffed arrestee's head against a vehicle); See, Slicker v. Jackson, 215 F.3d 1225, 1227 (11th Cir. 2002)(denying qualified immunity for an officer who kicked an arrestee already in handcuffs); Priester v. City of Riviera Beach, 208 F.3d 919, 926-27 (11th Cir. 2000)(denying qualified immunity to officers who allowed a police dog to attack an arrestee who was already on the ground); and, Smith v. Maddox, 127 F.3d 1416 (11th Cir. 1997)(trial-worthy issue present where, although officer was entitled to use some force, he struck a blow that broke Plaintiff's arm, after Plaintiff was already on the ground being handcuffed).

The court finds the plaintiff's argument unpersuasive. In the present case even if the court had reached the issue of whether the actions of Dade County defendants or Jason Geddie violated clearly established law, the court would still determine that the conduct on the part of Herbert, Ellis, Joe Geddie, and Jason Geddie was not "so far beyond the hazy border" between illegal and acceptable force as to deny these defendants of qualified immunity.

Furthermore, the court finds that each of the cases cited by the plaintiff in his response brief, is factually dissimilar from the current matter. Each of the cases cited by the plaintiff

41

involved force used against arrestees who were already restrained or force that was used against individuals who had not even arguably committed a crime.   In this case, the police officers applied only the force necessary to effect the arrest of the plaintiff.

### 3. Deliberate Indifference Claim Against Herbert

The plaintiff also argues that Herbert was deliberately indifferent to his serious medical needs.   In his First Amended Complaint, the plaintiff alleges, "After the above-described beating, even though Plaintiff Reese had an obvious and grotesque injury to his arm, Defendant Herbert failed to provide immediate and adequate medical attention to Plaintiff Reese for several hours."[26]

A government officer violates the Fourteenth Amendment and thereby gives rise to a § 1983 claim only in the event that two requirements are met--first, the alleged deprivation must be, objectively "sufficiently serious," and second, the officer must,

---

[26] The plaintiff citing to Thomas v. Town of Davie, 847 F.2d 771, 772-73 (11th Cir. 1988) and Ancata v. Prison Health Services, Inc., 769 F.2d 700, 704 (11th Cir. 1985), argues, "The fact that the officers created the injury themselves and then delayed the necessary medical treatment may also provide an inference that the officers acted with deliberate indifference."   However, the Eleventh Circuit in both Thomas and Ancata were reviewing the district court's dismissal of a complaint on a motion to dismiss. The court's current inquiry is different.   In this case, the court is evaluating the defendants' motions for summary judgment, which has a significantly different standard of review than a motion to dismiss.

subjectively, have acted with deliberate indifference to the individual's serious medical needs. Farmer v. Brennan, 511 U.S. 825 (1994). "The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994).

No one disputes that the plaintiff had an objectively serious medical need, i.e., his broken left arm and dislocated shoulder. Additionally, the Dade County defendants "assume, only for purposes of this motion for summary judgment, that the medical condition alleged by Plaintiff was a 'serious medical need.'" Therefore, the court must examine only whether the plaintiff has proven the subjective element of a deliberate indifference claim.

To satisfy the subjective element of deliberate indifference to a plaintiff's serious medical need, a plaintiff must prove three things: "(1) subjective knowledge of a risk of serious medical need; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004).[27]

---

[27] In Bozeman v. Orum, 422 F.3d 1265, 1272-1274 (11th Cir. 2005), the Eleventh Circuit stated, "Demonstration of the level of subjective knowledge necessary to impute to the Officers a sufficiently blameworthy state of mind consists of two steps: the Officers 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [] must draw the inference.'" Whether Herbert had this level of subjective knowledge—that the plaintiff's arm was either broken or injured—is a question of fact subject to demonstration in the

43

In the present matter, Herbert argues that he "did not know Plaintiff's arm was injured until Defendant Herbert and Plaintiff had arrived at the Dade County Jail and Plaintiff's handcuffs had been removed." However, the court concludes that the record would authorize a reasonable jury to find that the plaintiff's arm was either injured or broken during the struggle to handcuff him and to find that the plaintiff's condition was subjectively known to Herbert.  On the audio of videotape from Herbert's patrol car, the plaintiff clearly yells, "You broke my arm" repeatedly both during the process of being handcuffed and after the plaintiff was in Herbert's patrol car.[28]  From this evidence, a reasonable jury could conclude that Herbert had subjective knowledge of the plaintiff's objectively serious medical need.

While the plaintiff has demonstrated that Herbert may have had subjective knowledge of the plaintiff's objectively serious medical

---

usual ways, including inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Farmer, 511 U.S. at 842.

[28] The Dade County defendants cite Rodriguez v. Farrell, 294 F.3d 1276, 1278 (11th Cir. 2002), for the proposition that "a police officer need not credit everything a suspect tells him.  This idea is especially true when the officer is in the process of handcuffing a suspect." However, Rodriguez dealt with an excessive force claim and not a deliberate indifference to the medical needs claim.  The Eleventh Circuit was addressing the police officer's liability on an excessive force claim which derived from a police officer's application of handcuffs after the suspect had informed the officer that he had injured his arm.  In this case, the court is addressing whether Herbert's delay in treating the plaintiff's injuries constituted deliberate indifference.

need, the plaintiff has failed to demonstrate that Herbert disregarded the plaintiff's need for medical attention or that Herbert's actions demonstrated more than gross negligence to the plaintiff's objectively serious medical need.   In reaching this conclusion, the court again examined the videotape from Herbert's patrol car.   This videotape reveals that Herbert transported the plaintiff to jail almost immediately after he was placed under arrest.   Herbert and the plaintiff arrived at the Dade County Jail at 8:23 p.m., only minutes after the plaintiff had been arrested.

It is undisputed that Herbert then advised the detention officer to call a medic, who arrived shortly thereafter and began to treat the plaintiff.   It is also undisputed that someone at the Dade County Jail called an ambulance to transport the plaintiff to the hospital within five minutes of the plaintiff's arrival at the Dade County Jail.   The plaintiff was en route to the hospital by 8:56 p.m, within 35 minutes of arriving at the Dade County Jail.

Given these facts, the Dade County defendants argue, "[T]here is no legitimate basis for arguing that medical treatment was denied to Plaintiff or that same was delayed."   The court agrees and concludes that the delay from the time the plaintiff was arrested until the medic at the Dade County Jail examined the plaintiff or when an ambulance was called to transport the plaintiff to the hospital, i.e., a matter of minutes, is not

actionable under the Constitution, given the circumstances here.[29]

### 4. Supervisory Claims against Street

In his First Amended Complaint, the plaintiff alleges:

23. Defendant Street's continued failure to adequately train and supervise his deputies in the use of force, Defendant Street's actions amounted to deliberate indifference to the rights of the citizens of Dade County, Georgia, and Plaintiff Reese to be free from excessive force which proximately caused the use of excessive force described herein against Plaintiff Reese.

24. Defendant Street's actions and inactions as alleged above amount to negligent supervision and training of his deputies amounted to callous indifference and deliberate disregard for rights of arrestees, which proximately caused the above referenced use of excessive force against Plaintiff Reese.

"It is well established in this Circuit that supervisory officials are not liable under § 1983 for unconstitutional acts of

---

[29]The plaintiff cites <u>Brown v. Hughes</u>, 894 F.2d 1533, 1538-1539 (11th Cir. 1990), for the proposition that "the requirement to provide medical attention is greater and more immediate if the defendants have inflicted the pain upon the Plaintiff themselves." However, the court finds the plaintiff's reliance on this quotation to be misplaced. The Eleventh Circuit in <u>Brown</u> stated, "Even if we recognize as de minimus [sic] delays of a few seconds or minutes, a deliberate delay on the order of hours in providing care for a serious and painful broken foot is sufficient to state a constitutional claim." The cases cited by <u>Brown</u>, <u>Aldridge v. Montgomery</u>, 753 F.2d 970, 972-73 (11th Cir. 1985) and <u>Hughes v. Noble</u>, 295 F.2d 495 (5th Cir. 1961), involved delays of several hours or longer. <u>McElligott v. Foley</u>, 182 F.3d 1248 (11th Cir. 1999) also relied upon by the plaintiff is, likewise, inapplicable. In <u>McElligott</u>, the defendants did not provide the plaintiff with pain medication for days. In this case, the record clearly reflects and it is undisputed that the plaintiff received medical treatment within minutes, not hours, of being injured. The court is unable to find an Eleventh Circuit case that supports the proposition that a delay of a few minutes in treating a broken arm, even if caused by the police officers themselves, is actionable.

their subordinates on the basis of respondeat superior or vicarious liability." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999). Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a casual connection between the actions of the supervising official and the alleged constitutional deprivation. Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990). The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he [she] fails to do so." Braddy v. Fla. Dept. of Labor & Employment, 133 F.3d 797, 802 (11th Cir. 1998). However, the "standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." Id. Alternatively, the casual connection may be established when a supervisor's "custom or policy. . . . result[s] in deliberate indifference to constitutional rights" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003).[30]

---

[30] Put another way, the necessary causal connection

can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he [she] fails to do

The plaintiff does not allege that Street personally participated in the alleged unconstitutional conduct which led to the plaintiff's injury.  Therefore, the plaintiff must show the causal connection between the actions of Street and the plaintiff's alleged constitutional deprivation via one of the alternative methods articulated by governing case law.  On this point, the plaintiff alleges his response to the Dade County defendants' motion for summary judgment that there is a casual connection between the other defendants' use of excessive force and the plaintiff's injury based on Street's failure to institute a system of tracking and recording complaints made against his deputies for the alleged use of excessive force.[31]

It is undisputed that the Dade County Sheriff's office under Street did not retain a log of complaints against officers. According to Street, if an individual called him and complained about one of the deputies, Street would tell that individual to

---

so.  The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences.

Brown, 906 F.2d at 671.

[31]As stated above, the court denied the plaintiff leave to file a Second Amended Complaint to add new facts and causes of action. Therefore as the First Amendment Complaint stands, the allegations that Street's failure to keep logs of complaints of excessive force was casually connected to the events that transpired on September 13, 2003, in his First Amended Complaint is not an allegation properly before the court.  However, the court has opted to examine this potential cause of action out of an abundance of caution.

file a written complaint.  When an individual would file a written complaint against one of Street's employees, Street would read the complaint and then turn it over to the investigators or the employee's division supervisor for further inquiry, or, if the allegations were serious enough, call the Georgia Bureau of Investigation to investigate.  Street testified that he had received one or two complaints about an employee using excessive force in the 20 years he has served as Dade County Sheriff.

However, the Dade County defendants argue, "there is no evidence in the record that would provide a causal link between said alleged failure and the alleged use of force on Plaintiff on September 13, 2003."  Additionally, the Dade County defendants argue, "Plaintiff admitted in his deposition that he had no knowledge that Defendant Street knew about prior incidences of use of excessive force by his deputies and failed to take corrective action and further states that he always thought Defendant Street was doing a good job as Sheriff."[32]

---

[32] With regard to Street's knowledge of previous incidents of excessive force in Dade County, the plaintiff testified:

Q: Can you tell me specifically who has called you and told you that they were either involved or knew of other acts of excessive force prior to September 18, 2003.

A: No, but I've got some names, I took their names and phone numbers.

Q: You have those names?

A: Sure, they're around somewhere.

The court finds that the record is devoid of any evidence either that there was a wide spread use of excessive force or that Street knew that such a problem existed and did not take any action to stop such abuses.  Even assuming that Street had knowledge of one or two complaints in twenty years as he testified to, the court concludes that knowledge of one or two incidents is far from the knowledge of widespread use of excessive force by his deputies necessary to hold him liable.[33]

---

Q: Okay. But you don't remember them, you just have them written down somewhere?

A: Yeah, one guy was, I remember some of the things they told me.

Q: Okay. But would you have those names somewhere?

A: Possibly, but nobody ever asked for them, so.

Q: Well, I'll talk to your attorney about that.

Mr. Dean: I'll be glad to get those and get them to you.

Q: Yes. Okay.  Then in paragraph 21 you say that Sheriff Street knew about all these other incidents, this is prior to your incident, that he knew about all these other incidents about excessive force being used by his deputies, but he didn't really do anything to try to stop it, didn't train them, didn't try to supervise them or try to discourage that.

A: I wouldn't personally know that.  Frankly I was, I always thought he was doing a pretty good job because of some of the people that complained about him.

[33] The plaintiff cites to <u>Vineyard v. County of Murray</u>, 990 F. 2d 1207 (11th Cir. 1993) for the proposition that "lack of use of force reports and failure to log and properly investigate all complaints of misconduct was enough to support liability." However, the plaintiff ignores the procedural posture of <u>Vineyard</u>.

In summary, the plaintiff points to no specific facts connecting Street and his policy of not keeping a log of the complaints of excessive force to the actions of the four police officers.   Since the plaintiff has failed to establish the requisite causal connection; there is no basis for supervisor liability.   Thus, Street is entitled to qualified immunity and any claim for supervisory liability against him is dismissed.[34]

---

In Vineyard, the Eleventh Circuit was reviewing a trial court's verdict which had found the county and Sheriff liable and had awarded damages to the plaintiff.   In Vineyard, the Eleventh Circuit reviewed whether there was sufficient evidence presented to the jury to support a finding that the county's inadequate policies of training, discipline, and supervision were the moving force behind the constitutional violation.   In Vineyard, the plaintiff not only submitted evidence of the lack of use of force reports and failure to log and properly investigate all complaints of misconduct, but he also submitted additional evidence including expert testimony and the testimony of the Sheriff who stated it was "not unusual to receive complaints."   Given the evidence submitted to the trial court, the Eleventh Circuit in Vineyard concluded that the district court judge did not err in denying the motion for a directed verdict and allowing the case to go to the jury.   However, the court's current inquiry differs significantly from the inquiry conducted by the Eleventh Circuit in Vineyard.   The court's current inquiry is to determine whether the plaintiff has produced sufficient evidence to prove that there is a casual connection between the actions of a supervising official and the alleged constitutional deprivation as to strip Street of his qualified immunity, not to determine whether there is sufficient evidence to uphold a jury verdict on an appeal.

[34] The Dade County defendants argue, "Even assuming arguendo that Plaintiff has alleged the violation of a constitutional right, Defendant Street is still entitled to qualified immunity as he did not violate clearly established law."   The court agrees.   The only case cited by the plaintiff, Vineyard, is insufficient to have given Street a clear and fair warning that his conduct in failing to institute a policy to track and record complaints of excessive complaints was illegal.

### IV. Conclusion

For the reasons stated above, the plaintiff's motion for leave to file a Second Amended Complaint is DENIED [Doc. No. 33]; the Dade County defendants' motion to disallow the plaintiff's use of expert witness is GRANTED [Doc. No. 50]; the Dade County defendants' "Notices of Objection" [Doc. Nos. 52, 53, and 54] are treated as motions to strike and are DENIED; the Dade County defendants' "Notice of Objection" with regard to the affidavit of Keller is treated as a motion to strike and is GRANTED [Doc. No. 51]; the Dade County defendants' motion for leave to file excess pages in their brief in support of their motion for summary judgment is GRANTED [Doc. No. 23]; the Dade County defendants' motion for summary judgment is GRANTED in its entirety [Doc. No. 24]; and Jason Geddie's motion for summary judgment is GRANTED in its entirety [Doc. No. 28].   The Clerk of the Court is directed to CLOSE this matter, each party to bear their own costs and attorneys fees.

SO ORDERED, this _10TH_ day of July, 2006.

_Robert L. Vining, Jr._
ROBERT L. VINING, JR.
Senior United States District Judge